MARRERO, DEMANDANTE Y APELADO, *v.* THE AMERICAN RAILROAD
COMPANY OF PORTO RICO, DEMANDADA Y APELANTE.

No. 2947.—*Visto:* Junio 12, 1923. *Resuelto:* Mayo 29, 1924.

NEGLIGENCIA— DAÑOS Y PERJUICIOS— ALEGACIONES— CAUSA DE ACCIÓN.— No es necesario que en la demanda se alegue la ley, reglamento, jurisprudencia o costumbre que imponga el deber del demandado para con el demandante, si de los hechos surge la existencia de tal deber. Tampoco que se expongan los hechos en todos sus detalles. Éstos pueden establecerse luego por la prueba.

ID.—PATRONO—EMPLEADO—RESPONSABILIDAD DEL PATRONO POR LOS ACTOS DE SU EMPLEADO.—Examinadas las circunstancias concurrentes en este caso, se concluyó que el patrono era responsable de los actos negligentes de su empleado.

ID.—CAMINO PÚBLICO—CARRETERAS INSULARES.—Demostrando la prueba testifical, así como el resultado de la inspección ocular, que el accidente ocurrió en un paso a nivel que cruza un camino o callejón abierto al público durante el día, por el que transitan vehículos y personas, es preciso concluir que no erró la corte al calificar de público dicho camino. Tal declaración no implica que la corte calificara el camino de carretera pública insular.

ID.—PASOS A NIVEL—PRECAUCIONES AL CRUZARLOS—AUTOMÓVILES DE VÍA.—Una compañía ferrocarrilera está obligada a dar aviso por medio de campana o silbato no sólo al acercarse a un cruce existente en calle o carretera insular sí que también a un cruce con un camino privado carretero usado por el público, reconocido por la propia compañía que colocó ella misma los avisos permanentes necesarios para advertir su existencia; y tal obligación, así como todas las que impone el art. 3, letra q, de la Ley Núm. 70 definiendo las compañías de servicio público * * * , aprobada en 1917, referentes a locomotoras, deben cumplirse por los automóviles de vía de las propias compañías.

ID.—NO CONTRIBUTORIA.—No puede atribuirse negligencia contributoria a un demandante que antes de cruzar un paso a nivel se detuvo, observó la vía en tanto en cuanto la configuración del terreno y sembrados le permitían hacerlo y que no viendo ni oyendo nada anormal cruzó la vía en momentos en que apareció súbitamente y a gran velocidad corriendo sobre ella el automóvil que le causó las lesiones.

ID.—PRUEBA CONTRADICTORIA.—Introdujo la demandada como prueba en este caso cierta declaración prestada por el demandante en la clínica, poco tiempo después de herido, ante un notario, tomada por un agente de la compañía

demandada. En ella se consignaba que el accidente se originó al tratar el demandante de salvar una vaca que conducía. El demandante presentó prueba pericial y de testigos tendente a demostrar que el demandante no se encontraba en condiciones de declarar a conciencia después del golpe recibido en la cabeza y de haber sido anestesiado para la amputación del brazo, y que contestaba afirmativamente a todo cuanto se le preguntaba. *Se resolvió:* que la corte inferior procedió correctamente negando crédito a tal prueba de la demandada.

SENTENCIA de *T. Bryan,* J. (Mayagüez), en pleito de indemnización declarando con lugar la demanda con las costas. *Confirmada.*

*M. Acosta Velarde,* abogado de la apelante; *Benet & Souffront,* abogados del apelado.

EL JUEZ PRESIDENTE SEÑOR DEL TORO, emitió la opinión del tribunal.

El presente es un pleito sobre daños y perjuicios. La sentencia se dictó en contra de la demandada condenándola al pago de $2,900, y ésta apeló, señalando en su alegato la comisión de ocho errores, a saber:

"1. La Corte erró al dictar sentencia contra la demandada porque la demanda no aduce hechos suficientes para determinar una causa de acción a favor del demandante.

"2. La Corte incurrió en manifiesto error al dictar sentencia contra la demandada porque el demandante no presentó evidencia tendente a demostrar ni probó que la persona que guiaba el automóvil de vía y que se alega ocasionó el accidente fuese o era empleado de la demandada.

"3. La Corte erró al dictar sentencia en contra de la demandada porque no hubo prueba de que el automóvil de vía que se alega arrollara al demandante estuviese manipulado por un empleado de la Corporación demandada o que dicha persona estuviese en el desempeño de sus obligaciones como tal empleado de la demandada o dentro de sus atribuciones de su cargo como empleado de la demandada.

"4. La Corte incurrió en manifiesto error al dictar sentencia en contra de la demandada por el fundamento de que el camino por donde caminaba el demandante y sitio donde ocurrió el accidente era un camino público.

"5. La Corte incurrió en manifiesto error al dictar sentencia en contra de la demandada por el fundamento de que la demandada no acortó la velocidad del automóvil de vía que se alega arrolló al

demandante ni que el auto de la demandada diera aviso alguno al acercarse al sitio del accidente.

"6. La Corte incurrió en manifiesto error al dictar sentencia contra la demandada por el fundamento de que la demandada fué negligente en el manejo o manipulación del automóvil de vía que se alega arrolló al demandante y que esto era la causa próxima del accidente.

"7. La Corte incurrió en manifiesto error al declarar que el demandante no fué culpable de negligencia contributoria.

"8. La Corte incurrió en manifiesto error al dictar sentencia a favor del demandante porque según el peso y preponderancia de la prueba, la demandada no fué culpable de negligencia ni de la causa próxima del accidente y según el claro peso y preponderancia de la prueba el demandante fué culpable de negligencia contributoria siendo esto la causa próxima e inmediata del accidente."

Examinemos el primer error. Sostiene la parte apelante que la demanda no aduce hechos suficientes para determinar una causa de acción contra la demandada, porque en ella no se alegan hechos ni circunstancias de los cuales surja un ·deber por parte de la demandada para con el demandante.

En la demanda se sostiene que el demandante fué arrollado por un automóvil de vía de la demandada al cruzar la vía por un paso a nivel que intercepta un camino transitado que existe frente a una central azucarera que se encontraba en plena molienda, hechos conocidos por la demandada, sin que el demandante pudiera evitarlo no obstante haberse parado y observado, pues dicho automóvil apareció de súbito y a velocidad excesiva, extraordinaria, sin dar aviso de su aproximación en forma alguna.

No es necesario que en la demanda se alegue la ley, reglamento, jurisprudencia o costumbre que imponga el deber del demandado para con el demandante, si de los hechos surge la existencia de tal deber. Tampoco que se expongan los hechos en todos sus detalles. Estos pueden establecerse luego por la prueba. La demanda, a nuestro juicio, es suficiente, sobre todo examinada en conexión con la evidencia

aportada en el acto de la vista. Quizá sea conveniente expresar que aquí la prueba presentó un caso más completo que el expuesto en la demanda y que la cuestión suscitada en el primer error se levantó por vez primera ante este Tribunal Supremo. No quiere esto decir que una cuestión semejante no pueda levantarse de tal modo, pero después que la prueba ha suplido cualquier deficiencia de la demanda, la posición del demandado es muy distinta.

La conclusión a que hemos llegado está estrechamente relacionada con los otros errores señalados. Al estudiarlos y resolverlos, tendremos ocasión de fijar con mayor claridad y precisión nuestro criterio. Todos se refieren a la prueba y parece oportuno comenzar por transcribir los hechos declarados probados por la corte sentenciadora. Son así:

"En virtud de la prueba practicada, la corte entiende que ésta estableció concluyentemente los siguientes hechos:

"Qué Ramón Marrero el demandante el día 12 de junio de 1921 y como a la una más o menos de la tarde conducía una vaca en dirección a los terrenos contiguos a la factoría de la central The Mayagüez Sugar Co., desde los terrenos opuestos a la misma, separados de aquéllos por las vías de la demandada, teniendo necesariamente que atravesar el paso nivel o la vía indicada, frente a la factoría de dicha central; que a esa misma hora y en dirección Norte, la demandada manejaba por dicha vía un automóvil de su propiedad, tripulado por empleados de la misma en funciones propias del ejercicio de sus deberes y ocupaciones habituales, como tales empleados, de la demandada, el cual automóvil venía a una velocidad excesiva guiado descuidada y negligentemente, sin tomar precaución alguna para garantizar las vidas de las personas que pudieran cruzar por dicha vía y sin dar aviso en forma alguna de su aproximación al paso nivel existente frente a la central The Mayagüez Sugar Co., el cual se encuentra indicado con los signos de costumbre; que la demandada no acortó la velocidad de su dicho automóvil al acercarse a dicha central y paso nivel ni dió aviso alguno al acercarse o cruzar otro paso nivel que se encuentra a unos ochenta metros distantes antes que aquél, ni acortó la velocidad ni dió señal o aviso alguno al tomar una curva que se encuentra como a diez o

veinte metros antes del primer paso nivel o sea como a cien metros del paso nivel en que fué arrollado el demandante.

"Quedó probado también satisfactoriamente, a juicio de la Corte, que el demandante transitaba con la dicha vaca por un camino público que conduce desde la carretera a la factoría de la Mayagüez Sugar Co. por donde transitan muchas personas que necesariamente tienen que atravesar la vía de la demandada por dicho sitio para llegar a la factoría, siendo así que la demandada tenía que saber que dicha factoría estaba en plena actividad por estar en época de zafra, máxime cuando los establecimientos de dicha factoría especialmente sus chimeneas se distinguen desde cualquier punto de la vía y tenían que haber sido observados por los tripulantes del automóvil aludido, quienes sabían que se acercaban a la plaza de una central.  Que el demandante Ramón Marrero antes de llegar al paso nivel se detuvo a una distancia conveniente miró hacia la parte Norte de la vía sin que pudiera hacerlo hacia la parte Sud por impedírselo una plantación de caña y unas cepas de malojillo que llegaban hasta muy cerca de la vía; que asimismo escuchó para cerciorarse de si se aproximaba por la vía algún tren, locomotora o automóvil, pero no habiendo oído aviso alguno de la aproximación de tren, máquina o automóvil alguno, echó por delante la vaca que traía y salió del callejón hacia la vía donde fué cogido y arrollado por el automóvil de la demandada mencionado, sin que tuviera tiempo de poderlo evitar, pues dicho automóvil apareció de súbito y a una velocidad tan excesiva, sin haber dado aviso alguno de su aproximación que el demandante no pudo advertirlo, a pesar de que por lo peligroso de dicho cruce, la demandada debió haber usado cuidado especial para evitar un accidente, y asimismo da por probado que dicho accidente fué motivado única y exclusivamente por la gran negligencia y descuido de la demandada al manejar dicho automóvil en la forma alegada sin que el demandante incurriera en negligencia alguna contributoria, habiendo quedado la Corte absolutamente convencida que dicho accidente no hubiese ocurrido de haber la demandada ejercido debido cuidado, acortando la marcha del automóvil y dando aviso de su aproximación.

"La velocidad que llevaba dicho automóvil puede juzgarse por las propias declaraciones de los testigos de la demandada, tripulantes del automóvil que manifestaron no haberse dado cuenta del accidente, a pesar de que el mismo es un hecho probado indubitablemente.

"La corte encuentra asimismo probado que como resultado del accidente relacionado, el demandante sufrió la fractura conminuta

del húmero en su tercio inferior del brazo derecho, sufriendo además laceraciones y contusiones de importancia en el aspecto interno de la pierna derecha, laceraciones y heridas en la región frontal izquierda y laceración en el tercio inferior de la pierna izquierda, y que tuvo que ser conducido a la clínica del Dr. Pedro Perea en la ciudad de Mayagüez, donde sufrió la amputación del brazo derecho como consecuencia de la fractura del húmero, habiendo estado recluído en cama con grave peligro de su vida por el término de 42 días durante los cuales sufrió dolores extremadamente agudos y curaciones dolorosas, habiendo quedado dicho demandante inútil e imposibilitado para el trabajo, debido a la pérdida de su brazo derecho, por lo que los daños alegados en la demanda, o sea la suma de dos mil dólares por la pérdida de su brazo derecho e imposibilidad física para los trabajos agrícolas a los cuales se dedicaba el demandante durante un tiempo prudente de 25 años, la suma de cuatrocientos dólares por gastos médicos, medicinas y clínica, más la suma de quinientos dólares por los padecimientos físicos y morales sufridos por el demandante incluyendo los dolores agudos producidos por los golpes y contusiones y por las curaciones, han quedado satisfactoriamente probados.''

Un estudio cuidadoso de la transcripción, nos lleva a concluir que la prueba fué debidamente apreciada por la corte, y que en aquellos extremos en que hubo conflicto, no se ha demostrado que dicha corte al resolverlo actuara movida por pasión, prejuicio o parcialidad, o que cometiera error manifiesto.

Hecha esta afirmación general, siguiendo el orden adoptado por la propia parte apelante en su alegato, examinaremos conjuntamente los errores segundo y tercero.

Sostiene la parte apelante que no hubo prueba que demostrara que el automóvil que ocasionó el accidente fuera guiado por un empleado de la demandada, ni que el empleado de la demandada que en él iba hubiera actuado dentro del radio de sus atribuciones, motivos por los cuales no puede concluirse que la demandada sea responsable por el daño causado. Y cita la apelante en apoyo de su contención, entre otras, las siguientes autoridades:

''Un amo es responsable por los actos de sus sirvientes cometidos

durante el curso de su empleo, pero no por los actos cometidos fuera de su empleo." *Kline* v. *C. P. R. R. Co.*, 37 Cal. 400.

"Fuera de los límites de su empleo es tan extraño a su amo como cualquiera otra persona." Story on Agency, 452; Smith on Master and Servant, 160.

La demandada admitió que un automóvil de vía de su propiedad pasó de San Germán a Mayagüez como a la una de la tarde del 12 de junio de 1921, ocupado por Arturo García, Jorge Orcasitas y Pedro Fernández, y está demostrado por la evidencia más allá de toda duda razonable que fué dicho automóvil el que ocasionó el accidente.

¿Quiénes eran los viajeros? Orcasitas, declarando como testigo de la parte demandada, dijo que trabajaba con la demandada en calidad de pagador, que en cumplimiento de su deber salió de San Juan para Ponce en el tren para pagar. Preguntado: "¿En qué forma regresó usted?", contestó: "Nosotros tuvimos, yo tuve que quedarme en el taller, por un agente que quedaba por pagar en el taller de Ponce y oí decir que estaba el carro ese allí, y entonces el muchacho este García dijo que él sabía manejar y yo le dije, pues vámonos en él, porque yo tenía que ir a San Juan, era domingo y quería pasarlo en casa, y además al otro día había oficina y yo tenía que estar allí." Negó que tuviera atribuciones para tomar el automóvil de vía y preguntado: "¿Cómo obtuvieron Uds. el auto?", contestó: "El auto estaba allí, me dijeron que estaba allí el carro y yo quería irme para San Juan y como este muchacho me dijo que sabía manejarlo, yo le dije vamos a cogerlo y nos vamos en él a San Juan."

García, también declarando como testigo de la parte demandada, dijo que para la fecha del accidente era un detective del gobierno. Preguntado: "¿Iba con Ud. el pagador de la compañía?," contestó: "Iba el pagador y otro empleado de la compañía, yo iba en calidad de detective. Estábamos en período de huelga y había que vigilar la vía y cuidar el personal de la compañía." Manifestó además que

salió de San Juan con el pagador en el tren, que perdieron el tren en que debían regresar y "Entonces 'encontré un señor Fernández de apellido y tuvimos una conversación y Orcasitas dijo si hubiera algún auto por ahí 'lo cogeríamos y nos marcharíamos." Preguntado "¿Quién cogió el auto?", contestó: "Pues el auto lo iba a coger Orcasitas pero don Pedro se opuso y puso una razón muy poderosa y le dijo, García conoce el camino, va con Uds. y puede tomar precauciones en las cuadrantes y en los pasos niveles, porque yo creo que con siete años de práctica tengo suficiente para apreciar cuando debo retrancar, y ahora me sometería a una prueba también de que conozco los caminos, cogí el guía, los frenos mejor dicho porque ese carro no tiene guía, solamente frenos y gasolina y al llegar un poco más allá de Guayanilla paré el carro porque los abanicos no funcionaban y se calentaba mucho."

Fernández, el otro viajero, no declaró. Según los otros testigos era un empleado de la demandada que venía a San Juan para curarse un brazo en el Auxilio Mutuo.

A nuestro juicio las declaraciones de Orcasitas y García examinadas en relación con la realidad de los hechos, sostienen el criterio de la corte sentenciadora. La demandada es responsable. Orcasitas era su pagador. Fué a Ponce en el cumplimiento de sus deberes. Su oficina estaba en San Juan. Debía regresar a ella y debía aprovechar el domingo. Esto último se deduce de su dicho: "Perdí el tren." Y lo perdió por no haber podido terminar a tiempo su trabajo. Entonces tomó el automóvil. Este tuvo que serle entregado o por lo menos su salida tuvo que ser conocida por los otros empleados de la compañía. Las vías están bajo el control de la compañía. No pueden usarse a cualquier hora. Todo obedece a un plan trazado con exactitud matemática. De otro modo los choques serían inevitables. Por más que el pagador dijo que quería regresar a su casa por ser día de fiesta, declaró también que tenía que estar al día si-

guiente en su oficina. Se concibe su declaración tendente a liberar de responsabilidad a la compañía, pero la realidad de los hechos se impone.

Lo mismo sucede con la declaración del detective García. Era sí un funcionario del gobierno, pero en aquel momento servía a la compañía y se encargó del manejo del automóvil con el consentimiento del pagador y a sugestión de Fernández, el otro empleado.

Bajo esas circunstancias, creemos que el pagador actuó dentro del radio de sus atribuciones, con el conocimiento y consentimiento de la demandada, al tomar el automóvil de vía para regresar a San Juan. Pero aunque hubiera desobedecido las órdenes del patrono, éste sería responsable.

"Un amo no sólo está obligado a dar instrucciones adecuadas a sus sirvientes cuando los envía a mandados en que puede él quedar sujeto a responsabilidad, sino que está obligado a ver que sus instrucciones sean obedecidas." *McClung* v. *Dearborne*, 8 L. R. A. 204.

"La regla es que en cuanto a los actos de un sirviente dentro del límite general de su empleo mientras se encuentra al servicio de su amo, cometidos con el propósito de beneficiar el servicio o los intereses del amo, éste será responsable bien que el acto se cometa negligente, licenciosa o aún maliciosamente, y aun cuando el acto concreto haya sido en exceso de su autoridad y directamente contrario a sus instrucciones." *Terry* v. *Bufford*, L. R. A. 1915 F.

Sostiene la parte apelante al argumentar su cuarto señalamiento de error que fué grandemente perjudicada al declarar como declaró la corte que el demandante transitaba por un "camino público."

A nuestro juicio el error no existe. No creemos que la corte de distrito al usar dichas palabras tuviera la intención de sostener que se trataba de una carretera pública insular, por ejemplo. La palabra "público" está usada en el sentido de que el camino era transitado libremente por el público. No sólo existe la prueba de testigos sino la de

inspección ocular. En esta última se hizo constar lo que sigue:

"A partir de la carretera que conduce desde la ciudad de Mayagüez a San Germán hasta la Central azucarera 'Mayagüez Sugar Co.' hay un trozo de camino o callejón por el que transitan automóviles, carretas de bueyes y gentes de a 'pie,' teniendo la anchura necesaria para ello.

"A unos 40 metros antes de llegar a la factoría azucarera expresada, conocida por Central Rochelaise, el mencionado camino está cruzado en ángulo recto por la vía férrea de la American Railroad of Porto Rico que transita sus carros en dirección de Mayagüez a Ponce y vice-versa.

"Andando por el callejón en dirección a la Central se encuentra uno, a la mano derecha, con unos avisos de la Compañía demandada elevados en un poste que los hace conspicuos que tienen impresos en grandes letras las palabras 'mire, deténgase, oiga el tren', situados a ocho metros de la vía o sea del cruce de la misma con el camino."

Los errores cinco y seis deben estudiarse conjuntamente. Ambos se refieren a la negligencia de la demandada.

La prueba es evidente en el sentido de que el automóvil de la demandada cruzó el paso a nivel de que se trata sin dar aviso alguno y caminando a una velocidad extraordinaria.

Antonio Otero, dijo que el automóvil "iba muy ligero, a toda velocidad, ligero, ligero, a todo lo más ligero." Guillermo Lange, otro testigo del demandante, declaró que el automóvil caminaba a "una velocidad tremenda, que casi no se vió, como a cincuenta o sesenta millas." Santiago Guerra depuso: "Yo no sentí ruido de automóvil, el automóvil iba a una velocidad que casi no se veía." Y por último el testigo Antonio Rovira manifestó que la velocidad del automóvil era "fuerte, grande." Esas declaraciones, unidas a la deducción que de las propias manifestaciones de los que viajaban en el automóvil hace la corte sentenciadora en su declaración de hechos probados, sostienen la conclusión de dicha corte en cuanto a la velocidad extraordinaria.

¿Cuál era la condición del sitio? Ya hemos visto que la de un paso a nivel de un camino. Existía además otro paso a nivel como a ochenta metros de distancia y una curva a diez. Siendo ello así, ¿erró la corte sentenciadora al concluir que la demandada fué negligente y que su negligencia fué la causa del daño?

Invoca la parte apelante una decisión de esta Corte Suprema que estableció la siguiente doctrina:

"No hay regla alguna legal por la cual sea negligencia *per se* el que una compañía de tranvías corra sus tranvías a velocidad en una zona sub-urbana, y la jurisprudencia tiene una tendencia contraria. La conclusión a. que llegan las autoridades es que aunque la compañía de tranvías debe ejercer gran cuidado en la velocidad de sus tranvías dentro de la zona urbana, en las zonas inter-urbanas o rústicas el tranvía es más bien semejante a un ferrocarril, y la regla es que una persona que reclama daños por un accidente ocurrido en esas zonas, debe demostrar que la velocidad era irrazonable dentro de las circunstancias." *Morales* v. *Porto Rico Ry. Light & Power Co.,* 27 D.P.R. 769.

Y cita entre otras autoridades las siguientes:

"Aunque los empleados de la demandada omitieran el tocar campana y dar aviso por medio del pito, esto no constituye negligencia *per se.*" 22 R.C.L. 996.

"Aunque hay un ligero conflicto entre las autoridades en cuanto a si son necesarias las señales en los cruces privados, el peso positivo de las autoridades está en el sentido de que no son necesarias a menos que un estatuto así lo disponga." Elliot on Railroads, (2da. ed.) sec. 1150.

"El mero hecho de que la gente algunas veces o aún frecuentemente cruce la vía en un sitio donde no hay derecho al paso público no exige razonablemente que la Compañía lo considere como un cruce público y como regla general la compañía no está obligada como cuestión de derecho, en circunstancias ordinarias, a hacer señales de que se acerca uno de sus trenes." Elliot on Railroads, sec. 1151, p. 305 y casos citados en la nota 22. Véase R.C.L., tomo 22, sección 233, p. 1004. 33 Cyc. 964.

Para juzgar, en justicia, este caso, es necesario considerar en conjunto todas las circunstancias concurrentes.

No se trataba de un paso a nivel corriente, sino de un cruce hacia una central, cuyas chimeneas, según la prueba, se divisaban a distancia. Además existía cerca otro cruce y una curva, como hemos dicho, y los testigos declaran que los trenes de la compañía al pasar daban aviso. El cruce estaba debidamente reconocido. Había sido aceptado por la demandada. Ella había colocado los avisos acostumbrados para evitar accidentes.

La demandada es dueña de sus vías. Pero cuando admite un cruce, comparte su derecho. Acepta que el público puede, lo mismo que ella, usar el sitio. De ahí que tanto ella como el público tengan que tomar las debidas precauciones.

"Las obligaciones, derechos y deberes de los ferrocarriles y viandantes en los cruces de caminos son mutuos y recíprocos. Ninguno de ellos tiene un derecho exclusivo a usar sus vías y el público tiene el derecho de paso. El ferrocarril tiene el derecho a usar su vía y el público a usar el cruce, y cada uno debe actuar con la debida consideración a los derechos del otro. 22 R.C.L. pág. 987, sec. 215.

"3. La ley aplicable está contenida en el art. 3, letra *q.* de la Ley No. 70 definiendo las compañías de servicio público . . . . aprobada en 1917, (2), p. 449, que dice:

" 'Si se tratare de una compañía de ferrocarril, ésta deberá construir y conservar cadenas, portones u otros aparatos adecuados de protección, en todos los cruces a nivel de las carreteras públicas insulares y en los demás cruces públicos que la Comisión designare y, con sujeción a las reglas, reglamentos y órdenes de la Comisión, deberá cercar o de otra manera adecuada guardar o proteger sus vías, en aquellos sitios que la Comisión designare, de modo que los animales no puedan entrar en ella; deberá instalar en sus locomotoras campanas y silbatos que deberán usarse al acercarse a curvas, túneles y a los cruces de caminos o calles y siempre que fuere necesario como advertencia de la aproximación de dichas locomotoras y trenes los que reducirán la velocidad al mínimum en los cruces de calles; y deberá usar, después de la puesta del sol, las luces que sean necesarias y que la Comisión determine.''

Se sostiene que sólo hay obligación de usar las campanas y silbatos al acercarse a un cruce existente en una ca-

lle o carretera, dando a la carretera la condición de insular o enteramente dedicada al público. No estamos conformes. Cuando el legislador quiso referirse únicamente a las carreteras insulares lo hizo expresamente como en el párrafo primero del artículo transcrito. En el párrafo segundo usó la palabra "camino" que tiene un significado mucho más amplio. Por "camino" se entiende, según Escriche, "la tierra hollada por donde transitan los pasajeros de unos pueblos a otros, o por donde se va de un punto a otro. . . . . Los caminos son públicos o privados. Caminos públicos son los que van de un pueblo a otro; y privados, los que sólo sirven para usar el paso a las heredades de algún distrito. Unos y otros pueden ser carreteros o de herradura; son carreteros o carriles, aquellos por donde se puede andar en carruajes; y de herradura, aquellos por donde pasan caballerías."

El camino en este caso puede considerarse como un *camino privado carretero usado por el público* y por tanto al cruzar por el paso a nivel que sobre él existía, especialmente yendo como iba el automóvil a gran velocidad y existiendo como existían una curva y otro cruce tan cercanos, debió la demandada dar señales de su aproximación.

Es cierto que la ley se refiere a locomotoras, pero es cierto también que se hizo para imponer deberes a las compañías de ferrocarriles de servicio público y que regula el uso de las vías. Todo lo dicho con respecto a locomotoras, teniendo en cuenta el espíritu y el propósito de la ley, es aplicable a los automóviles de vía que pueden correr, según manifestó un perito en el acto de la vista, a sesenta y sesenta y cinco millas por hora, y que cruzan haciendo mucho menos ruido que las locomotoras.

El séptimo error se refiere a la negligencia contributoria del demandante. Examinada la evidencia resulta que según la declaración del propio demandante y la de varios testigos, el demandante conducía una vaca para los terrenos

de la central. Al llegar al cruce se detuvo y observó y como nada oyera ni viera, soltó la vaca que cruzó la vía y al él hacerlo, súbitamente apareció el automóvil y tuvo lugar el accidente sin poderlo él evitar. A virtud de la configuración del terreno y de unas siembras que existían, el demandante no podía ver sino muy poco del sitio por donde apareció el automóvil.

Introdujo la demandada como prueba cierta declaración prestada por el demandante en la clínica, poco tiempo después de herido, ante un notario, tomada por un agente de la compañía demandada. En ella se consignaba que el accidente se originó al tratar el demandante de salvar la vaca que conducía. El demandante presentó prueba pericial y de testigos tendente a demostrar que el demandante no se encontraba en condiciones de declarar a conciencia después del golpe recibido en la cabeza y de haber sido anestesiado para la amputación del brazo, y que contestaba afirmativamente a todo cuanto se le preguntaba.

A nuestro juicio la corte procedió correctamente al no dar crédito a la prueba de la demandada. Quedando en pie la del demandante, se concluye que éste fué todo lo diligente que pudo. El accidente se debió única y exclusivamente a la negligencia de la demandada.

Tampoco existe el octavo y último error, que es un resumen de todos los demás señalados. La prueba practicada es convincente. La indemnización que se pidió desde el primer momento fué moderada y aparece detalladamente explicada en la demanda. La sentencia pudo y debió dictarse como se dictó concediendo todo lo pedido, que no es lo usual en estos casos. El pleito fué laborioso y en sus alegatos ambas partes han presentado con amplitud y empeño sus respectivas posiciones. A nuestro juicio la única resolución justa que procede dictar *es confirmar la sentencia.*

Los Jueces Asociados Sres. Wolf y Aldrey disintieron.