E. Solé & Co., S. en C., demandante y apelante, *v.* American Railroad Company of Puerto Rico, demandada y apelada.

Núm. 8524.—*Sometido:* Febrero 9, 1943. *Resuelto:* Abril 7, 1943.

*Miranda & Miranda Esteve,* abogados de la apelante; *Mariano Acosta Velarde, Federico Acosta Velarde y Donald R. Dexter,* abogados de la apelada.

EL JUEZ ASOCIADO SEÑOR TODD, JR., emitió la opinión del tribunal.

La Corte de Distrito de San Juan declaró sin lugar la demanda en este caso en reclamación de daños y perjuicios y en la opinión que dictó en apoyo de su sentencia consideró probados los siguientes hechos:

". . . que allá para el día 26 de febrero de 1941 y como a las 11:15 a. m., un camión marca "Studebaker' propiedad de la demandante marchaba por la calle Nueva Palma de Santurce con dirección de este a oeste detrás de otro *truck* cargado de arena. . . . Al llegar el camión al paso a nivel del camino de Miraflores con la vía férrea, donde la demandada tiene un empleado encargado en dicho cruce de colocar cadenas para avisar al público de la aproximación del tren, el camión de la demandante, al pasar dicho sitio por sobre la vía férrea, se paró el motor, atascándose el truck en tal forma, que a pesar de los esfuerzos del *chauffeur* no pudo lograr hacer arrancar el motor con la manivela por lo que un tren de carga tirado por la máquina núm. 90 y propiedad de la demandada y que iba con rumbo a Arecibo vino a chocar con el camión de la demandante causándole desperfectos en el truck cuyo valor se reclama en este pleito . . . . que la vía del ferrocarril al acercarse, en dirección de San Juan a Santurce, al paso a nivel donde ocurrió el accidente, es una pendiente en escala ascendente y constituye una curva bastante violenta. El tren que ocasionó el choque era uno compuesto de una locomotora y 22 vagones cargados; el maquinista, con motivo de la caldera y la curva tan cerrada, no pudo distinguir el truck en el cruce y fué el fogonero quien a una distancia de 40 metros del truck le avisó de la obstrucción en la vía y entonces aplicó inmedia-

tamente los frenos no pudiendo detener el tren antes de llegar al cruce a pesar de todos los esfuerzos que hiciera para reducir la velocidad. La locomotora se paró como a 15 metros después de cruzar el paso a nivel e *iba a una velocidad de 15 kilómetros por hora.* El maquinista ocupa el lado derecho en la locomotora y no puede ver el lado izquierdo de la vía y tampoco la parte delantera de un truck estacionado en el cruce hasta la distancia de 20 metros del centro de la carretera; el fogonero, que va en su asiento al lado atrás de la máquina, a una distancia como de 8 metros del frente del botavaca no viene a distinguir el paso a nivel hasta una distancia de 40 a 50 metros y el muro que allí existe tiene una altura de 15 metros que también le impide ver el lado izquierdo. Por ese sitio un tren con 22 vagones cargados no puede subir la curva a una velocidad de 5 kilómetros por hora *necesitando cuando menos marchar a 10 kilómetros; el tren caminaba a 15 y a esa velocidad le era completamente imposible al maquinista parar el tren cuando vino a darse cuenta de la presencia del camión por aviso del fogonero a una distancia de 40 metros del cruce.''* (Bartardillas nuestras.)

En este recurso la apelante alega que la corte inferior al desestimar la demanda cometió cuatro errores, a saber: 1, al descartar el testimonio del perito de la demandante; 2, al considerar que la velocidad a que corría el tren de la demandada no constituía negligencia alguna; 3, al sostener que el guardabarrera no venía obligado a dar aviso al tren para que éste se detuviera y que el maquinista no estuviera obligado a estar pendiente de que el guardabarrera hiciera la señal de vía franca, y 4, al declarar sin lugar la demanda por las razones expuestas en los tres errores que preceden.

■ El primer error fué cometido. En su opinión la corte al referirse al testimonio del perito de la demandante, Ventura Manautou, se expresó así:

''El demandante no presentó prueba alguna sobre estos extremos pues la declaración de su llamado perito demostró que no lo era cuando manifestó que el tamaño o peso de un tren nada tenía que ver con el poder del maquinista para detenerlo en un caso dado. . . .''

Dicho perito declaró todo lo contrario. En el contrainterrogatorio a que fué sometido contestó que el tonelaje de una locomotora y el peso de los vagones tenían que ver con la

forma de pararse el tren; que el peso de la locomotora afecta la distancia que debe recorrer para pararse y a las páginas 51 y 52 de la Transcripción de. Evidencia aparece lo siguiente:

"P. ¿La locomotora con cinco vagones se para lo mismo que con veinte vagones?

"R. No puede pararse igual con cinco vagones que con veinte vagones.

"P. ¿Cuál se detiene primero?

"R. La de los cinco vagones se detiene primero."

Lo que declaró este testigo que pudo llevar al juez sentenciador a su errónea conclusión fué la contestación en la negativa que dió a las preguntas de si sabía cuántas toneladas tenían la locomotora en este caso y el peso de los railes de los trenes donde había trabajado. Es obvio que este desconocimiento expresado por el testigo no es suficiente para que se descarte la declaración de un perito que afirmativamente ha dicho que una locomotora con cinco vagones se detiene primero que una con veinte vagones, debiendo presumirse que uno de los factores tomados en consideración por el perito fué precisamente el tamaño y peso del tren.

Aún cuando este error por sí solo no sería suficiente para revocar la sentencia cobra importancia al relacionarlo con el segundo señalado.

Como hemos visto la corte inferior declaró como hecho probado que el tren de la demandada caminaba a una velocidad de 15 kilómetros por hora y que el maquinista, debido a la caldera y la curva en la vía antes de llegar al paso a nivel, no pudo distinguir el truck de la demandante en el cruce. Fué el fogonero quien, a una distancia de 40 a 50 metros del truck, le avisó de la obstrucción en la vía aplicando el maquinista los frenos pero a pesar de eso no pudo parar el tren hasta que había corrido como 15 metros más allá del paso a nivel después de chocar con el camión. Sobre estos hechos no existe controversia entre las partes. Ésta surge en cuanto a si la consecuencia de estos hechos—el choque—

especialmente la velocidad a que corría el tren, tomando en consideración el sitio y el tráfico, constituyen o no negligencia por parte de los agentes de la demandada que hagan a la compañía responsable de los daños causados al truck de la demandante.

El Juez sentenciador dedica gran parte de su opinión a discutir la regla prevaleciente en el derecho común en cuanto a la velocidad a que puede correr un ferrocarril en una zona urbana y, aunque cita varios casos, se basa principalmente en el de *Custer* v. *Baltimore & O. R. Co.*, 55 A. 1130, resuelto por la Corte Suprema de Pennsylvania y del cual entresaca en su opinión la siguiente doctrina:

"La regla que entresacamos de las autoridades y claramente expresada en *Custer* v. *Baltimore & O. R. Co.*, supra, *es que aún en cruces dentro de la zona urbana en ciudades y sitios poblados el ferrocarril puede correr a cualquier velocidad compatible con la seguridad de sus pasajeros y la carga que lleva siempre y cuando establezca cadenas o barreras y personas encargadas de su cuidado, no surgiendo la obligación del ferrocarril de reducir la velocidad y detener el tren hasta tanto el maquinista o fogonero descubra el peligro.*" (Bastardillas nuestras.)

Y más adelante dijo:

"De acuerdo, por tanto, con lo anteriormente expuesto, y con lo que creemos ser el concensus unánime de la jurisprudencia, *no constituye negligencia por parte de un ferrocarril el correr a velocidad exagerada por los cruces de las calles de una ciudad simpre y cuando que allí se tengan barreras o cadenas y una persona a su cuidado para proteger las vidas de los transeúntes al mismo tiempo que los conductores por medio del pito y la campana dan aviso de su aproximación.* Cuando la dueña del tranvía cumple con estas obligaciones no podemos comprender cómo puede existir el peligro de pérdidas de vidas humanas que tanto teme el abogado de la parte demandante." (Bastardillas nuestras.)

"       *       *       *       *       *       *       *

"El único caso que se nos ocurre puede suceder es uno como el de autos que sólo envolvería daños a la propiedad y como se dijo en

*Custer* v. *Baltimore & O. R. Co.*, supra, sería uno verdaderamente raro y excepcional. Las pequeñísimas pérdidas que pudieran ocurrir serían compensadas grandemente por los grandes beneficios económicos producidos por un servicio rápido y eficiente del ferrocarril.''

En efecto, lo que resolvió la corte de Pennsylvania fué que de acuerdo con las decisiones de dicho Estado prevalecen dos proposiciones, a saber:

''1. Que no hay límite a la velocidad en que una compañía de ferrocarriles puede correr sus trenes en campo abierto y en los caminos rurales, siempre que el límite de seguridad a sus clientes no sea sobrepasado. (citas) 2. En ciudades, pueblos y distritos poblados la velocidad de los trenes debe ser moderada o la compañía debe tomar precauciones razonables para que haya seguridad para el público que cruza sus vías. (citas) La conclusión a que llegó la corte sentenciadora en este caso parecería seguir naturalmente que cuando una compañía ha puesto barreras en un camino y ha puesto un guardián allí para proteger a los que pasan por el camino, *puede correr sus trenes a gran velocidad (high speed) en ese punto, aún cuando sea dentro de los límites de una municipalidad o de un distrito poblado.''* (Bastardillas nuestras.)

Somos de opinión que esta doctrina aplicada por la corte inferior no puede prevalecer en jurisdicciones donde, como en Puerto Rico, rige un precepto de ley que expresamente dispone la velocidad a que deben correr los ferrocarriles en la zona urbana. El inciso (*q*) del artículo 3 de la Ley de Servicio Público (Ley núm. 70 de 1917 (2) pág. 433), en lo pertinente dispone que: ''Si se tratare de una compañía de ferrocarril . . . deberán instalar en sus locomotoras campanas, silbatos que deberán usarse al acercarse a curvas, túneles y a los cruces de caminos o calles y siempre que fuere necesario como advertencia de la aproximación de dichas locomotoras y trenes *los que reducirán la velocidad al mínimum en los cruces de calles;* . . . '' (Bastardillas nuestras.)

Cuando por estatuto se fija una regla de conducta a ser cumplida por un ferrocarril en su cruce con una calle, su

violación constituye negligencia *per se.* 52 C. J. 250, sección 1837. En el caso de *Osborne* v. *McMasters,* 41 N. W. 543, se establece con claridad la diferencia entre la negligencia del deercho común y la estatutaria, en esta forma:

"Negligencia es la violación de un deber legal. Es inmaterial si el deber es uno impuesto por la regla de derecho común que requiere el ejercicio de cuidado ordinario para no causar daño a otro, o si es impuesto por estatuto aprobado para la protección de otros. . . . La única diferencia es que en un caso la medida legal se determinará por los principios del derecho común mientras que en el otro lo fija el estatuto, de manera que la violación del estatuto constituye evidencia conclusiva de negligencia *per se.* Todo lo que hace el estatuto es establecer una norma fija a virtud de la cual la negligencia pueda determinarse."

Véase Prosser *on Torts,* pág. 264, sección 39.

La corte inferior al considerar el alcance del inciso (*q*), supra, se expresó en esta forma:

"No hemos perdido de vista el inciso (*q*) de la sección 3 de nuestra Ley de Servicio Público. Ella impone a los ferrocarriles la obligación de reducir la velocidad a su mínimum en los cruces de calles; no dice la ley lo que debe considerarse como mínimum pero entendemos que no puede ser otro *que el que sea compatible con el poder de arrastre de la locomotora y la eficiencia del servicio y ya hemos demostrado que la velocidad que el tren llevaba era necesaria para que pudiera subir la pendiente que conducía al cruce."* (Bastardillas nuestras.)

Los dos únicos elementos tomados en consideración por el juez sentenciador para determinar lo que debe constituir "velocidad a su mínimum" fijada por la ley, es decir, que sea compatible 1, con el poder de arrastre de la locomotora y 2, con la eficiencia del servicio, no están en armonía ni con la letra ni con el espíritu del inciso (*q*) supra, que no es otro que el de salvaguardar la vida y la propiedad de los que transitan por las calles y caminos que son cruzados por los ferrocarriles. Los dos elementos mencionados toman en consideración únicamente la conveniencia y necesidad de la com-

pañía en cuanto al poder de arrastre de una locomotora, y en cuanto al público la eficacia del servicio. Empero, por encima de esos dos elementos está el tercero que hemos apuntado; la seguridad personal y de propiedad.

No importa que el caso sea, por sus hechos, extraordinario, ya que no es lo corriente que un truck se atasque precisamente en un cruce de ferrocarril, pero la ocurrencia demuestra la razón de la regla sobre velocidad mínima establecida por la ley. Frente a sus preceptos no pueden ni deben prevalecer otras reglas que sancionen la velocidad excesiva en un cruce siempre que se hayan puesto las barreras de seguridad. Pueden surgir otros casos en que no sólo se ocasione daño a la propiedad sino a las personas. En este mismo que resolvemos si el chófer por cualquier circunstancia no hubiera podido salir del truck antes de llegar el tren pudo haber sido arrollado y sufrido daños. *Cf. Domínguez* v. *P. R. Ry., Light & Power Co.,* 19 D.P.R. 1090, y *Marrero* v. *American Railroad Co.,* 33 D.P.R. 207.

Desde luego, que el tercer elemento depende para su existencia de que se haya probado o no que la velocidad a que marchaba el tren era o no la mínima a que podía marchar. Si no lo fué existió negligencia por parte de la demandada.

Aún cuando la corte inferior en una parte de su opinión admitió que el tren *"necesitaba cuando menos marchar a 10 kilómetros"* para subir la curva, no aplicó esta velocidad como la mínima que señala la ley, sino que habiéndose probado que el tren caminaba a 15 kilómetros llegó a la conclusión de que "la velocidad que el tren llevaba era necesaria para que pudiera subir la pendiente que conducía al cruce", y que "a esa velocidad le era completamente imposible al maquinista parar."

Esta conclusión no está sostenida por la prueba. No sólo la de la demandante sino que la de la propia demandada demostró que el tren podía subir la cuesta a 10 kilómetros por

hora. Su testigo Juan Velázquez, Ingeniero Jefe de Talleres y Depósitos declaró en el contrainterrogatorio:

"P. ¿Esa cuesta la puede subir a 10 kilómetros por hora?

"R. Sí, señor.

"P. ¿No es cierto que si sube esa cuesta a 10 kilómetros se pararía el tren?

"R. Puede ser. Yo creo que la puede subir.

"P. ¿Con los 22 vagones?

"R. Sí, señor.

"P. ¿No había peligro en que el tren fuera a diez kilómetros?

"R. No, señor.

"P. ¿Pararía yendo a 10 kilómetros en menos distancia que yendo a 15 kilómetros?

"R. Sí, señor.

"P. ¿Qué diferencia en metros habría yendo la máquina a 10 kilómetros por hora?

"R. A diez kilómetros por hora necesitaría para parar treinta metros.

"P. ¿Esa locomotora está fabricada para caminar a diez kilómetros por hora?

"R. Sí, señor.

"        *        *        *        *        *        *        *

"P. ¿Si ese tren hubiera ido a diez kilómetros por hora, hubiera podido parar antes de llegar al paso a nivel?

"R. Sí, señor.

"P. ¿Y a diez kilómetros por hora ese tren hubiera subido bien la cuesta?

"R. Posiblemente sí y posiblemente no; todo depende de las condiciones.

"P. ¿Con la máquina y potencia que usted conoce?

"R. La puede subir.

"P. ¿Y es mucho más fácil de detenerla?

"R. Sí, señor."

Ya el testigo había declarado que ese tren caminando a 15 kilómetros por hora necesitaba 60 metros para poder parar (T. de E. pág. 120).

El propio juez lo interrogó entonces en esta forma:

"Sr. Juez:—P. ¿Un tren caminando a diez kilómetros por hora y tomando como base este mismo tren, saliendo del túnel a diez kiló-

metros, puede parar si nota al salir del túnel algo antes de llegar al paso a nivel?

"R. Sí. Del túnel al paso a nivel hay 120 metros.

"P. ¿Desde qué sitio se comienza a ver y puede el fogonero ver el paso a nivel?

"R. A 40 metros del paso a nivel.

"P. ¿Y a qué distancia puede parar el tren en ese sitio yendo a diez kilómetros por hora?

"R. En ese sitio, a 30 metros puede parar sin considerar la reacción del maquinista y fogonero.

"P. ¿Vamos a considerar eso también?

"R. Pues yendo a diez kilómetros por hora, serían un promedio de dos metros por segundo, son cinco segundos; pues serían 40 metros.

"P. ¿O sea que vendría a parar en el mismo paso a nivel?

"R. Sí, señor."

El abogado de la demandada le preguntó entonces si había calculado el tiempo que tarda el fogonero en decirle al maquinista lo del *truck* y el tiempo que tarda éste en verlo y parar, y contestó que le concedía cinco segundos. Ya anteriormente había declarado este testigo que por los experimentos realizados con el personal del ferrocarril había sacado el promedio de cinco segundos como reacción desde que el maquinista es avisado para que pueda hacer los cuatro movimientos necesarios para aplicar los frenos. (Véase el caso de *Clark* v. *Boston & Maine R. R.*, 182 A. 175, 177, donde la corte le asigna un término de dos segundos a una reacción idéntica por parte del maquinista.)

El maquinista del tren si bien en una parte de su declaración dijo que aún corriendo a diez kilómetros no hubiera podido parar antes del cruce, en otra parte manifestó que si le hubiera dado tiempo suficiente hubiera parado y que marchando a diez kilómetros, con el aviso anticipado de parada (suponemos se refería al del fogonero), también hubiera parado antes del paso a nivel. Asimismo declaró que esa curva, debido al aumento del tráfico de los trucks del gobierno "es un sitio de peligro".

Esta prueba demuestra, sin dejar lugar a dudas, que el mínimum de velocidad que exige el inciso (*q*) supra, pudo cumplirse en el caso de autos si el tren hubiera corrido a diez kilómetros por hora y además que si el tren hubiera corrido a dicha velocidad hubiera podido detenerse antes o al llegar al paso a nivel. El tren no tenía que correr a quince kilómetros por hora para poder subir la pequeña pendiente y, por tanto, no era ése el mínimum a que debió correr, velocidad que fué la causa de que no pudiera detenerse hasta después de chocar con el truck en el cruce de la calle y, por consiguiente, es preciso concluir que se probó la negligencia de la demandada.

Ahora bien, para hacer responsable a la demandada de los daños causados a la demandante, esta negligencia tiene que ser la causa próxima del accidente sin que la demandante fuera culpable de negligencia contributoria. Somos de opinión que no se probó la negligencia contributoria, ya que el truck de la demandante se paró en el cruce, no por negligencia de su chófer, sino debido al hecho fortuito de haberse detenido inesperadamente el otro camión que le precedía y, al apagarse el motor del truck de la demandante quedó parado en el mismo cruce y por más esfuerzos que hicieron el chófer y su ayudante no pudieron echar a andar el motor durante cinco minutos. Si el tren de la demandada hubiera estado corriendo a la velocidad mínima que exige la ley en los cruces de calles hubiera parado antes o al llegar al cruce y se hubiera evitado el accidente y, por tanto, la negligencia de los empleados de la demandada fué la causa próxima del mismo.

No está envuelta en este caso la doctrina de la última oportunidad (*last clear chance*) como sostiene la apelada. La demandante no invoca esta teoría pues para su aplicación tendría que admitir su propia negligencia para entonces alegar que a pesar de esa negligencia la demandada tuvo la última oportunidad de evitar el accidente. Véase la extensa

monografía en 92 A.L.R. 47 y *Miranda* v. *P. R. Ry. Light & Power Co.*, 42 D.P.R. 719.

La prueba de la demandante, no contradicha por la demandada, demostró que la reparación del truck de la demandante valía $482.30 incluyendo piezas y mano de obra y que además aún después de reparado tenía una depreciación de $200. Ésta fué la cuantía de los daños probados.

*Debe revocarse la sentencia apelada y dictarse otra declarando con lugar la demanda y condenando a la demandada a pagar a la demandante $682.30 más los costas.*

EN MOCIÓN DE RECONSIDERACIÓN

## RESOLUCION

### Abril 27, 1943.

Por la Corte, a propuesta del Juez Asociado Sr. Todd, Jr.

Vista la moción de la apelada solicitando la reconsideración de la sentencia en este caso, fundada, entre otras razones que no consideramos necesario resolver de nuevo, en que por ella esta Corte sostiene que la violación del inciso (*q*) del artículo tercero de la Ley de Servicio Público, reglamentando la velocidad de los trenes en los cruces de calles constituye negligencia *per se* y no mera evidencia de negligencia.

POR CUANTO si bien en nuestra opinión hicimos referencia a autoridades que sostienen que la violación de un estatuto estableciendo una velocidad determinada constituye negligencia per se, nuestra decisión no tiene dicho alcance ya que el inciso (*q*), supra, no establece una velocidad determinada sino que se limita a imponer la obligación de reducir la velocidad "al mínimum en los cruces de calles" y resolvimos que de acuerdo con los hechos que la propia corte sentenciadora declaró probados el tren sólo "necesitaba cuando menos marchar a 10 kilómetros" y que a pesar de eso no aplicó esta velocidad como la mínima que señala la ley habiéndose demostrado por otra prueba que de haber marchado a dicha velocidad como mínimum el accidente pudo evitarse. De

hecho aplicamos la regla de que la violación del estatuto constituyó evidencia de negligencia que no fué debidamente apreciada por la corte inferior dentro de las circunstancias concurrentes del caso.

Por tanto, se declara sin lugar la moción de reconsideración.