GREGORIA ORTIZ, demandante y apelada, *v.* AMERICAN RAILROAD COMPANY OF PORTO RICO, demandada y apelante.

Núm. 8692.—*Sometido:* Abril 27, 1943. *Resuelto:* Junio 3, 1943.

182

Mariano Acosta Velarde, Federico Acosta Velarde y Donald R. Dexter, abogados de la apelante; R. Atiles Moréu y Francisco Capó Pagán, abogados de la apelada.

EL JUEZ ASOCIADO SEÑOR DE JESÚS emitió la opinión del tribunal.

Dámaso Ortiz, de doce años de edad, fué arrollado por uno de los trenes de la apelante el 5 de mayo de 1938 entre

7:30 y 8 de la noche, cerca del Desvío Ferri, en el barrio Machuelo Grande, de Ponce. Horas después falleció a consecuencia de la herida recibida. En reclamación de los daños y perjuicios que alegó haber sufrido con motivo de la muerte del indicado menor, su madre, la apelada, radicó el 5 de mayo de 1939 la demanda original en este caso, basando su causa de acción en las alegaciones de la segunda demanda enmendada, que pueden resumirse así:

Que la demandante es la única y universal heredera de su indicado hijo; que en la fecha y sitio antedichos, la demandada, una corporación doméstica, por medio de sus empleados debidamente autorizados, operaba un tren de carga; que el maquinista que conducía la locomotora, Vicente Bermúdez, sin ejercitar el debido cuidado, manejó la locomotora número 41 tan descuidada y negligentemente que arrolló a Dámaso Ortiz, pasándole sus ruedas sobre la rodilla y muslo derechos, siendo conducido al hospital Tricoche, donde murió horas después.

Especificando los actos de negligencia que imputó al conductor de la locomotora, alegó la demandante que el maquinista no tomó precauciones de clase alguna para evitar el accidente; que conducía dicha locomotora sin usar aparato de alarma y a una velocidad exagerada; que como resultado de dicho accidente la demandante se ha visto privada del cariño y ayuda de su fenecido hijo y ha sufrido angustias mentales, estimando los daños en la cantidad de $2,500, por la cual solicita sentencia, incluyendo además las costas y una suma razonable para honorarios de abogado.

Desestimada la excepción previa interpuesta por la demandada, radicó ésta su contestación, en la cual negó las alegaciones de la demanda, y bajo el título de "Materia Nueva" alegó:

(a) Que la acción, al ser ejercitada, estaba prescrita de conformidad con el apartado 2o. del artículo 1868 en relación con los artículos 8, 1802, el apartado 3o. del artículo

1860, y el artículo 1869, todos del Código Civil. Basa su contención la demandada en que como el accidente ocurrió el 5 de mayo de 1938 y la demanda se radicó el 5 de mayo de 1939, ya había transcurrido para esa fecha más de un año desde que la demandante se enteró del daño sufrido, y que por lo tanto la demanda no aduce hechos constitutivos de causa de acción.

(b) Que existió negligencia contribuyente por parte del menor, que fué la causa próxima y única del accidente.

(c) Que en la fecha del accidente el menor Dámaso Ortiz, sin el consentimiento o conocimiento de la demandada, se montó en uno de los vagones arrastrados por la locomotora número 41, y mientras el tren pasaba por el Ramal Barrancas, se cayó o se lanzó del sitio que ocupaba en el vagón, yendo a parar a la vía, siendo arrollado por uno de los vagones, resultando su pierna derecha fracturada. Por último, que la demandada empleó toda la diligencia de un buen padre de familia para prevenir el daño.

En el acto del juicio y antes de dar principio a la práctica de la prueba, la demandante solicitó permiso para enmendar su demanda, haciendo constar que la corporación demandada fué organizada bajo las leyes de Nueva York y no de Puerto Rico como equivocadamente se había alegado. Con la oposición de la demandada, la Corte permitió la enmienda, procediéndose al juicio.

La demanda fué declarada con lugar, basándose la sentencia en las siguientes conclusiones de hecho y de derecho:

Que el accidente ocurrió entre claro y oscuro, que el tren venía a mucha velocidad y sin tocar pito o campana, y que el maquinista, teniendo como tenía conocimiento de que en aquel sitio acostumbraban jugar niños, debió anticipar la presencia de éstos, y sin embargo no ejercitó el debido cuidado para evitar el accidente. Que la teoría del transgresor (*trespasser*) está condicionada en el sentido de que en sitios densamente poblados donde muchas personas acostumbran

cruzar la vía del tren, la compañía debe tomar precauciones especiales. Que la obligación de la demandada de adoptar precauciones en evitación de accidentes no está limitada exclusivamente a los pasos a nivel. Que aunque el menor tenía doce años de edad, estaba aun en primer grado y no hay evidencia en el récord de que fuera un muchacho despierto, induciendo todo a creer que era tardío de comprensión y de poco desarrollo mental. Que la negligencia contribuyente es una defensa afirmativa que a la demandada corresponde establecer, y que esta última no presentó prueba alguna para sostenerla, descansando exclusivamente en la prueba de la demandante en lo que a dicha defensa respecta.

¿Erró la corte *a quo* al permitir en el acto del juicio y antes de dar principio a la práctica de la prueba, que se enmendase la segunda demanda enmendada en el sentido de sustituir la alegación de que la demandada es una corporación organizada de acuerdo con las leyes de Puerto Rico por la de que lo fué de acuerdo con las de Nueva York?

No existe controversia en cuanto a la identidad de la corporación que fué demandada y se personó en autos. A ella pertenece el tren envuelto en el accidente y los que lo conducían eran sus empleados, actuando dentro de las atribuciones de sus empleos. No existe en Puerto Rico otra corporación de ferrocarriles con ese nombre, ni se intentó siquiera demostrar que la demandada sufriera perjuicio alguno con motivo de la orden permitiendo la enmienda. En tales circunstancias, preciso es concluir que actuó correctamente la corte sentenciadora al permitirla. *Bahr* v. *American Railroad Co.*, resuelto el 17 de mayo de 1943 (61 D.P.R. 917).

¿Había prescrito la acción al radicarse la demanda original el 5 de mayo de 1939?

La causa de acción de la demandante fué dirigida a recobrar daños por la muerte de su hijo. Por consiguiente, no fué a partir de la fecha en que la demandante tuvo cono-

cimiento de haber ocurrido el accidente, sino desde que tuvo conocimiento de la muerte, cuando surgió a su favor y pudo ejercitar la causa de acción. En la demanda se alegó que el accidente tuvo lugar el 5 de mayo de 1938 "a las siete de la noche más o menos", y que el herido fué trasladado al Hospital Tricoche "muriendo . . . horas más tarde". La alegación así redactada es ambigua. Es susceptible de dos interpretaciones, a saber: que la muerte ocurrió el 5 de mayo, si la frase "horas más tarde" comprende un número de horas insuficiente para pasar de las doce de la noche del día del accidente, o que ocurrió el 6 de mayo si dicha frase se interpreta en el sentido contrario. Y como cuando una alegación es ambigua, como sucede en este caso, la alegación debe interpretarse en el sentido menos favorable para la parte que la hace—pues se presume que ha expuesto su caso en la forma más favorable a sus intereses—tenemos que aceptar, a los efectos de la excepción previa, que el fallecimiento del menor tuvo lugar el 5 de mayo de 1938. *Aitken* v. *Southwest Finance Corp. of Calif.*, 20 P. (2d) 1000; *Miller* v. *Price,* (Cal.) 284 P. 1035; *Goodfellow* v. *Barritt* (Cal.) 20 P. (2d) 740; *Vilardo* v. *Sacramento County,* 129 P. (2d) 165, *Feldesman* v. *McGovern* (Cal.) 112 P. (2d) 645. Pero el artículo 388 del Código Político dispone que el tiempo en que cualquier acto prescrito por la ley debe cumplirse, se computará excluyendo el primer día e incluyendo el último, a menos que éste sea día de fiesta, caso en el cual también será excluído. Y comentando el artículo 7 del Código Civil español, idéntico al 8 del nuestro, que prescribe el significado que debe darse en las leyes a las palabras "meses", "días" y "noches", dice Manresa, refiriéndose al significado de "año":

"El Código no habla de años, pero aplicando el principio en que inspira su art. 7º., parece que el año debe reputarse compuesto de doce meses naturales y consta de 365 días, a no ser que la ley o el pacto hagan referencia a un año determinado y éste sea bisiesto." Comentarios al Código Civil, tomo 1, pág. 89.

De conformidad con la evidencia, la demandante tuvo conocimiento del fallecimiento de su hijo inmediatamente después de haber ocurrido, por haber sido ella avisada del accidente y hallarse en el Hospital Tricoche con tal motivo. Así pues, si tomamos el 6 de mayo de 1938 como punto de partida para practicar la computación, es decir, si excluímos el día 5 de conformidad con el citado artículo del Código Político, tendremos por resultado que los 365 días vencieron el 5 de mayo de 1939, y por consiguiente al radicarse la demanda en esta última fecha, la acción no estaba prescrita. Parece conveniente consignar que como cuestión de hecho el fallecimiento acaeció en las primeras horas del 6 de mayo de 1938, conforme resultó de la certificación de defunción admitida en evidencia.

El caso de *González* v. *Pérez,* 57 D.P.R. 860, invocado por la apelada, no es de aplicación. Bastará decir que en aquél el accidente ocurrió en julio 17 de 1938 y la demanda fué radicada en enero de 1940, adoptando el lesionado la posición de que no conoció la inutilidad de su pierna hasta 34 días después de ocurrido el accidente. Tanto tiempo había transcurrido en exceso del concedido por la ley para establecer la acción cuando la demanda fué radicada en enero 19 de 1940, que este Tribunal no tuvo necesidad de considerar el punto que ahora resolvemos.

Resueltas las dos cuestiones preliminares, pasamos a considerar los méritos del recurso.

■■ ¿Están sostenidas por la prueba las conclusiones de hecho a que llegó la corte? ¿Son correctas sus conclusiones de derecho?

De conformidad con las alegaciones de la demanda, al ocurrir el accidente el niño se hallaba parado en un camino vecinal que parte de un punto en la carretera a cierta distancia del paso a nivel y sigue a lo largo de las vías del tren, apartándose después de pasar del sitio del accidente para perderse en otra dirección. Este camino, de acuerdo con las

fotografías admitidas sin oposición de la demandante, no se halla adyacente a la vía del ramal en que ocurrió el accidente. Por el contrario, de conformidad con la declaración no contradicha del ingeniero civil Octavio Augusto Seda, testigo de la demandada, entre la vía del ramal y el camino se halla el Desvío Ferri, y del centro de la vía general por donde iba el tren en el momento del accidente a la orilla más cercana del camino hay una distancia de $4\frac{1}{2}$ metros (T. de E., pág. 128). Véase también la fotografía marcada *exhibit* C de la demandada. De suerte que era físicamente imposible que estando el niño en el camino en cuestión, pudiera ocurrir el accidente a menos que hubiera habido un descarrilamiento, y en este caso no lo hubo. No obstante esa alegación de la demanda, los testigos de la demandante que declararon respecto a la manera en que sucedió el accidente, o sea Raúl Santiago, Reinaldo Gutiérrez y Miguel Martínez Almodóvar, lo describen así:

Raúl Santiago: Declaró que cuando fué a cruzar el paso a nivel vió venir el tren a gran velocidad y se detuvo para dejarlo pasar. No oyó pito o campana. Estaba oscuro y la locomotora traía las luces encendidas. Oyó gritos de muchachos y fué al sitio donde estaba el niño herido, como a sesenta pies del paso a nivel. El testigo se hallaba a cuatro metros del paso a nivel cuando oyó el tren y se dió cuenta de su aproximación por el ruido que hacía. Cuando llegó donde se hallaba el niño, habían alrededor de éste cinco o seis personas.

Reinaldo Gutiérrez: Declaró que vive como a 100 pies de la carretera y vió a Dámaso caminando por la vía, así como la locomotora, que venía ligero. Que el accidente ocurrió al oscurecer. Que no oyó aparato de alarma porque estaba pendiente de su trabajo, arreglando un carro al frente de su casa, pero oyó el ruido de la locomotora. En el curso de su declaración hizo el siguiente comentario: "No sé lo que le pasaría al muchacho, creo que él iba ciego y como allí es

una pendiente, aunque la máquina quisiera aguantar, los vagones se la llevaban. . . . Estaría aturdido cuando no vió la máquina." Cuando el testigo fué a ver el muchacho lesionado, tenía una pierna dentro de la vía y el cuerpo hacia fuera. Después del accidente fué cercado el desvío. El trayecto donde ocurrió el accidente es una recta. La locomotora no se detuvo. Cuando la locomotora arrolló al niño, éste se hallaba como a 100 pies del paso a nivel. El tren y el niño iban en direcciones contrarias. Desde que el testigo lo vió hasta que lo arrolló la locomotora, el niño caminó diez pasos. Que los muchachos estaban jugando en el patio de la casa del testigo y que el único que estaba dentro de la vía era Dámaso Ortiz; que el camino que pasa junto a la vía dista de ésta cinco o seis pies; que el sitio donde ocurrió el accidente es una barriada y si los muchachos querían se metían a la vía.

Miguel Martínez Almodóvar: El testigo hacía media hora que estaba parado en el paso a nivel. Estaba oscuro. No oyó aparato de alarma, pero se dió cuenta que venía la locomotora por la luz de ésta, que se ve de lejos, y por el ruido que hacía. Después de pasar la locomotora, un muchacho vino a avisarle que el tren había matado a alguien. El sitio del accidente es más arriba del paso a nivel. Que al llegar donde estaba el niño encontró que éste tenía las piernas dentro de la vía y el cuerpo hacia fuera. Que el niño no era de aquel barrio y le manifestó, cuando fué a prestarle auxilio, que iba por la vía arriba y que la locomotora lo había arrollado. Declaró además el testigo que llegó a la conclusión de que la locomotora venía ligero por el ruido que hacía.

El testigo de la demandada Rafael Rivera, a repreguntas del abogado de la demandante declaró en relación con la costumbre de jugar en el sitio del accidente:

"P. ¿Y Uds. acostumbraban a jugar allí al palo, al esconder?
"R. Allí al frente.
"P. ¿Frente a la vía?
"R. A la casa.

"P. ¿Donde principia el camino que va pegado a la vía?

"R. Sí, señor.

"P. ¿Acostumbraban todos los días jugar ahí?

"R. Algunas tardes.

"P. ¿De cinco a' siete de la noche todas las tardes?

"R. Jugábamos." (T. de E., 159.)

Debemos tener en cuenta en relación con esta declaración que el camino empieza en la carretera a unos treinta metros del paso a nivel y que entre el empalme del camino con la carretera y el paso a nivel hay dos casas, siendo una de ellas la de la guardabarrera. (T. de E., 138.) También debemos tener presente que del paso a nivel al sitio del accidente hay una distancia de 42 metros. (T. de E., 125.)

La prueba de la demandada tiende a demostrar, mediante manifestaciones que hiciera el niño a algunos de sus testigos, que el lesionado se había montado en uno de los vagones del tren y al pasar de un vagón a otro se cayó, siendo arrollado por las ruedas de uno de ellos.

Veamos ahora si dando entero crédito a la prueba de la demandante relacionada con el accidente, las conclusiones de hecho y de derecho a que llegó la corte *a quo*, en que basó su sentencia, están sostenidas por la prueba.

Que el accidente ocurrió al oscurecer y que la locomotora traía sus luces encendidas, está perfectamente sostenido por la prueba. Dos testigos de la demandante declararon que el tren venía a mucha velocidad y sin tocar aparato de alarma. Los de la demandada que presenciaron el accidente, entre ellos dos que no eran empleados suyos, sostuvieron que venía a poca velocidad y que oyeron tocar pito y campana. Esta manifestación de los testigos de la demandada encuentra apoyo, hasta cierto punto, en el hecho de que la guardabarrera, cuya casa está a 42 metros del sitio del accidente, recibió el aviso de la aproximación del tren con tal anticipación que le permitió extender las cadenas a uno y otro lado del paso a nivel. Pero como la evidencia fué contradictoria y la corte sentenciadora dió crédito a la de la demandante,

aceptaremos que el tren venía a mucha velocidad y que no hizo uso de aparato de alarma. Empero, no podemos aceptar como correcta la conclusión de la corte inferior al efecto de que el maquinista tenía conocimiento de que en el sitio del accidente acostumbraban jugar niños y que debía anticipar la presencia de éstos y ejercitar el debido cuidado para evitar el accidente. Un solo testigo de la demandante, Reinaldo Gutiérrez, declaró que aquella tarde los muchachos estaban jugando en el patio del testigo. Otro testigo de la demandada, Rafael Rivera, quien en la fecha del accidente tenía veinte años de edad, declaró a repreguntas del abogado de la demandante, que él y otros muchachos jugaban *algunas tardes* frente a la casa. El mero hecho de que algunos muchachos jugasen en un sitio más o menos distante de la vía del ferrocarril, no imponía deber alguno a los empleados de la demandada de anticipar que en los momentos de pasar por allí el tren pudiese haber muchachos dentro de la vía. No debemos perder de vista que los trenes tienen sus itinerarios a que deben ajustarse, y solamente debe obligárseles a reducir la velocidad y a tomar extraordinarias precauciones cuando en realidad exista un motivo razonable que lo justifique. Además, el que *algunas tardes* los muchachos jugasen en dicho sitio no es un hecho tan ostensible que justifique la conclusión de la corte *a quo* al efecto de que los empleados de la demandada sabían de estos juegos y consiguientemente tenían el deber de tomar precauciones. De la prueba no resulta que los empleados de la demandada tuviesen conocimiento de tales juegos. Por el contrario, las declaraciones no contradichas de dichos empleados demuestran que supieron por primera vez del accidente cuando fueron arrestados en Ponce en momentos en que engrasaban la locomotora para salir para Guayanilla.

No encuentra apoyo en la evidencia la conclusión de la corte sentenciadora al efecto de que todo induce a creer que el niño era tardío de comprensión y de poco desarrollo men-

tal. Lo natural es que toda persona tenga por lo menos inteligencia normal, y por consiguiente debe presumirse, mientras no se demuestre lo contrario, que este niño no era mentalmente defectuoso. Es verdad que al ocurrir el accidente el niño tenía doce años de edad y que según declaró su madre estaba en primer grado de instrucción primaria, pero esto no implica necesariamente que fuese "tardío de comprensión y de poco desarrollo mental". Hay analfabetos de toda la vida que a pesar de no haber recibido instrucción tienen inteligencia natural, y por el mero hecho de que no sepan leer y escribir no hemos de concluir que son mentalmente defectuosos. Puede que la falta de instrucción se deba, como corrientemente sucede, a falta de oportunidad para recibirla. El hecho de que el niño caminase por la vía en la forma en que lo hacía el día del accidente tampoco significa necesariamente defecto mental, pues constantemente estamos viendo que personas inteligentes y aun cultas incurren en actos de negligencia que a veces les cuesta la vida.

La evidencia toda demuestra que el niño era un transgresor (*trespasser*), pues él no había sido invitado por la compañía para caminar por la vía, ninguna gestión hacía para la compañía en aquellos momentos, ni tenía licencia expresa o tácita para caminar por la vía de la demandada. Siendo el menor un transgresor, el único deber que con respecto a él tenían los empleados de la compañía era, una vez descubierta su presencia en el sitio de peligro, usar diligencia razonable para no hacerle daño. Tanto el maquinista como el fogonero tienen otros deberes inherentes a sus empleos respectivos, y no tratándose de un paso a nivel ni siendo aquél un sitio densamente poblado, como equivocadamente sostuvo la corte inferior, pues sólo había dos casas, una de ellas de la empleada de la compañía, ni teniendo ellos cualquier otro motivo para anticipar la presencia de alguna persona, no venían obligados a estar constantemente mirando hacia la vía para descubrir algún transgresor que pudiese

caminar por ella. .[7] Tampoco era deber de la compañía mantener en la locomotora un centinela constantemente vigilando la vía; [8] ni era deber de sus empleados tocar aparato de alarma excepto en el paso a nivel, a menos que viesen o tuviesen motivo para crear que podían hacer daño a alguna persona o animal que estuviese en la vía o próxima a penetrar en ella.

Podría quizá argüirse que habiendo ocurrido el accidente a una distancia de 42 metros del paso a nivel, la demandada venía obligada a tocar aparato de alarma y reducir la velocidad. Tendría alguna fuerza el argumento si el accidente hubiera ocurrido en el paso a nivel, puesto que el toque de aparato de alarma es para avisar a los que atraviesan la vía por dicho sitio. De manera que no era ése un deber que la demandada debía al indicado menor. Véase *Ferrer e Hijo* v. *American Railroad Co.*, 39 D.P.R. 40. Pero aunque lo fuera, no fué ésa la causa próxima del accidente, pues conforme declaró un testigo de la demandante, Raúl Santiago, que estaba en la carretera a más de cuatro metros del paso a nivel, se dió cuenta de la aproximación del tren por el ruido que traía y por la luz de la máquina, que alumbraba la vía. Además, si el niño, que caminaba de frente hacia la locomotora, no pudo oír el ruido del tren ni mucho menos fué afectado por el foco de la locomotora—que tuvo por necesidad que herir fuertemente su pupila—no vemos qué influencia hubiera tenido el haberse tocado pito o campana.

■ No existe ninguna ley fijando un máximo de velocidad, excepto en los pasos a nivel. Los deberes impuestos por la ley a la demandada constan en el apartado (*q*) del artículo 3 de la Ley de Servicio Público de Puerto Rico, que dice así:

"(*q*) *Aparatos de seguridad en cruces, etc.*—Si se tratare de una compañía de ferrocarril, ésta deberá construir y conservar cadenas, portones u otros aparatos adecuados de protección, en todos los cruces a nivel de las carreteras públicas insulares y en los demás cruces públicos que la Comisión designare, y, con sujeción a las reglas, re-

glamentos y órdenes de la Comisión, deberá cercar o de otra manera adecuada guardar o proteger sus vías, en aquellos sitios que la Comisión designare, de modo que los animales no puedan entrar en ella; deberá instalar en sus locomotoras campanas y silbatos *que deberán usarse al acercarse a curvas, túneles y a los cruces de caminos o calles y siempre que fuere necesario como advertencia de la aproximación de dichas locomotoras y trenes los que reducirán la velocidad al mínimum en los cruces de calles; y deberá usar, después de la puesta del sol, las luces que sean necesarias y que la Comisión determine.*" Leyes de Puerto Rico, 1917, pág. 433. (Bastardillas nuestras.)

En el caso de *McCarthy* v. *New York, N. H. & H. R. Co.*, (C.C.A.) 240 F. 602, un padre instó acción de daños y perjuicios contra una compañía de ferrocarril por la muerte de su hijo, que tenía entre seis y siete años de edad. Demostró la evidencia que el demandante vivía en una casa que había alquilado a la compañía. Los terrenos de la casa se extendían hasta la vía del ferrocarril, que distaba unos 25 ó 30 metros de la escalera de la parte de atrás de la casa. No existía cerca alguna que separase la vía de los terrenos de la casa, ni el contrato de arrendamiento imponía a la arrendadora el deber de ponerla. El niño penetró en la vía en momentos en que venía el tren. Según declaró el maquinista, él vió al niño cuando éste se hallaba a una distancia de treinta pies de la locomotora y aplicó el freno de emergencia y trató de parar tan pronto como pudo, pero según su declaración no contradicha, un tren que corra a 40 millas no puede pararse a una distancia menor de alrededor de 300 pies. La madre del niño declaró que en el momento del accidente se hallaba en una casa vecina; que la casa donde ella estaba tenía todas las ventanas y la puerta abiertas de par en par y que no se había usado aparato de alarma. El maquinista aseguró en su declaración que él tocó el pito tan pronto como él vió al niño en la vía. Al confirmar la sentencia que desestimó la demanda, la corte se expresó así:

"Toda persona que va a la propiedad de otra es un transgresor si va allí por mera curiosidad o para fines propios y sin invitación ex-

presa o tácita ni para cumplir un deber para con el demandado. Un niño de tierna edad puede ser un transgresor. (Citas.) Aunque en *Kansas City Suburban Belt R. Co.* v. *Herman* (Kan. App.) 62 Pac. 543, se decidió que un niño de cuatro años no podía ser un transgresor, y la misma corte en *Missouri Pacific R. Co.* v. *Prewitt,* 7 Kan. App. 556, 51 Pac. 923, decidió que un niño de dos años no podía ser un transgresor, la regla general, sin embargo, es que la tierna edad del niño no puede tener el efecto de imponer un deber donde antes no existía, y el hecho de que el transgresor sea un niño no impone al dueño de la propiedad obligación alguna de mantener su propiedad en condiciones de seguridad. (Citas.)

''La regla general es que una compañía de ferrocarril no tiene la obligación de ejercitar vigilancia activa para impedir hacer daño a los transgresores en sus vías o derechos de paso mientras su presencia en ellos no sea conocida. (Citas.) En cuanto a los transgresores la regla es que debe ejercitar cuidado razonable para evitar hacerles daño después de descubrir el peligro en que se hallan. (Citas.) Como regla general un ferrocarril no tiene más deber hacia un niño que es un transgresor que el que tiene hacia un adulto. (Citas.)

'' *       *       *       *       *       *       *

''El conflicto en la evidencia bajo las circunstancias del caso no tiene importancia, toda vez que no hay evidencia en el récord al efecto de que el maquinista viera al niño a una distancia mayor de 30 pies ni tampoco hay evidencia que impusiera a los empleados a cargo de la locomotora el deber de estar mirando hacia adelante mientras se aproximaban al sitio del accidente . . .

'' *       *       *       *       *       *       *

''En un número de casos las cortes han resuelto que cuando la evidencia tiende a demostrar que existe un motivo para esperar que hayan personas en la vía en el sitio donde ocurre el accidente, la compañía es responsable por la negligencia del maquinista al no tratar de descubrirlas aunque él no las hubiese visto en la vía. (Citas.) Pero si no existen motivos para esperar que haya personas en la vía y el maquinista no vió la persona lesionada, en tal caso la compañía no es responsable de su negligencia al no tratar de descubrirla. (Citas.)

''La compañía puede ser responsable a un transgresor por dejar de ejercitar cuidado razonable para descubrirlo y evitar hacerle daño cuando tenga motivos para anticipar su presencia en aquel sitio. Pero en este caso no hay evidencia que indique que el demandado tuviese motivo para esperar que hubiese alguna persona en el sitio donde ocurrió este accidente.''

Desde el 1905, este Tribunal, en el caso de *Pérez* v. *The American Railroad Co. of P. R.,* 9 D.P.R. 218, por voz de su Juez Asociado Sr. MacLeary, estableció la regla en esta jurisdicción, expresándose en los siguientes términos:

"En primer lugar, debemos conocer la situación en que se encontraba el interfecto con respecto a la compañía demandada, y cuáles eran los derechos y obligaciones existentes entre ambos. Si el cruce hubiera estado en un camino público y se hubiera encontrado el interfecto de viaje por el camino, de una manera legal, los derechos del viajero y los de la compañía del ferrocarril hubieran sido iguales y recíprocos; pero por cuanto el tren se encontraba necesariamente limitado a su vía, y uno que vaya a pie puede gobernar sus movimientos de una manera tal que evite un choque, más ligeramente que puede hacerlo el maquinista con tal objeto, la obligación se impone al que va a pie, para dejar el camino y tomar precauciones razonadas para su propia defensa. *Morrissey* v. *Eastern R. R. Co.* (126 Mass. 377). 30 Am. Rep. 687.

"Pero cuando el que marcha a pie va por la vía del ferrocarril, o atraviesa la misma por un cruce particular, sin tener permiso del amo del terreno, o de la compañía de ferrocarril, *entonces dicha persona es un infractor de la ley, y únicamente tiene derecho a tal cuidado de parte de los empleados de la compañía del ferrocarril, a fin de impedir la imprudencia, y se evite causar perjuicio voluntariamente.* El que traspase la vía del ferrocarril, debe tomar extraordinarias precauciones para su propia guardia, y a no ser por descuido o negligencia de parte de los empleados de la compañía del ferrocarril, ni la persona perjudicada ni sus herederos, si la muerte proviene, pueden entablar una acción contra la compañía de ferrocarril para recobrar daños y perjuicios ocasionados por el choque. (Citas.)" (Págs. 223-4; bastardillas nuestras.)

"Parece que existe la creencia entre la gente de la costa del norte, que la vía del ferrocarril es un camino público, y que todo el mundo tiene derecho a andar por ella, o correr a caballo por la misma cuando le plazca, y algunas veces los que van a pie dudan con respecto a si ellos deben dejar el camino a la locomotora o no. Ya es tiempo de que en esta Isla se sepa, como en el continente, que el uso de una vía de ferrocarril está reservado solamente a la compañía de ferrocarril y al propietario del suelo, con exclusión de los demás, excepto cuando está cruzada por un camino público. Esta regla es necesaria, no ya para la protección de la propiedad, sino para la conservación de la vida. . . . " (Pág. 225.)

Véase además *Helring* v. *Delaware & Hudson Co*. (C.C.A. 1931), 54 F. (2d) 493.

A nuestro juicio la prueba que tuvo ante sí la corte *a quo* no demostró que la demandada hubiese dejado de cumplir algún deber hacia el menor, y por consiguiente tendremos que resolver que la demandada no fué culpable de negligencia. [11] Pero en caso de que lo hubiera sido, tampoco sería responsable del accidente, porque la evidencia de la propia parte demandante demuestra que el niño fué culpable de negligencia contribuyente, [12] pudiendo la demandada descansar exclusivamente en la prueba de la demandante para sostener dicha defensa. Véanse la monografía titulada *Burden of Proof as to Contributory Negligence*, que aparece en 33 L.R.A. (N. S.) 1085, especialmente a la página 1183, y los casos de *Emanuel et ux*. v. *Wise et ux*. (Wash. 1941) 118 P. (2d) 969, *Cruse* v. *Dole* (Kan. 1942) 124 P. (2d) 470, y *Peavey* v. *City of Miami* (Fla. 1941) 1 So. (2d) 614, 618.

*Procede declarar con lugar el recurso, revocar la sentencia apelada y dictar otra declarando sin lugar la demanda, con costas a la demandante.*

El Juez Presidente Sr. Del Toro no intervino.