Sucesión de Juan Tomás Ortiz Robles, etc., demandantes, apeladas y apelantes, v. Arturo Ramírez, trabajando bajo el nombre de La Línea Nueva, demandado, apelante y apelado.

Núm. 9497.—*Sometido:* Noviembre 13, 1947. *Resuelto:* Marzo 29, 1948.

R. *Rivera Zayas*, G. *Rivera Cestero* y *José O. Sabater*, abogados del apelante apelado; *Luis Mercader*, abogado de los apelados apelantes.

EL JUEZ ASOCIADO SEÑOR SNYDER emitió la opinión del tribunal.

Los demandantes, herederos de Juan Tomás Ortiz Robles, instituyeron pleito contra el demandado en solicitud de daños y perjuicios ascendentes a $8,000, como resultado de la muerte de Ortiz ocasionada por un automóvil público propiedad del demandado. Después de un juicio en los méritos, la corte de distrito dictó sentencia a favor de los demandantes en la suma de $3,500, costas y $150 para honorarios de abogado. El demandado apeló, señalando como errores el haber dejado la corte de distrito de resolver (1) que el accidente se debió a la negligencia del interfecto y (2) que el accidente tuvo como causa próxima y única la negligencia contribuyente del interfecto.

Sinteticemos primeramente la evidencia ofrecida por los demandantes. Emilio Hernández declaró que él iba guiando un camión cargado de caña con destino a la Central Cambalache, por la carretera militar que corre de Quebradillas a Arecibo; que lo acompañaban Ortiz y un peón; que paró el camión al lado de un puente con el fin de permitirle a Ortiz, quien iba para la Central Riollano a una diligencia, que se desmontara; que Ortiz se bajó y se dirigió a la parte de atrás del camión con el fin de cruzar la carretera para tomar el camino vecinal de la Central; que el automóvil público venía en dirección contraria de Arecibo a Quebradillas a una velocidad de 45 a 50 millas; que no oyó la bocina del automóvil; que éste le dió un golpe a Ortiz y fué a detenerse como a 38 trancos; que no sabe si Ortiz salió de detrás del camión a la carretera despacio o ligero, debido a que no lo vió por estar dentro del camión; que la ca-

rretera militar tiene en ese sitio 22 metros de ancho; que el camión estaba parado más hacia la orilla derecha de la carretera que hacia el medio; que el camión es como de seis pies de ancho; que antes de que el automóvil público llegara a la parte delantera del camión él sintió que el chófer empezó a frenar.

José Díaz Beitía, el peón, declaró que durante la zafra trabaja con Hernández; que el automóvil público venía a velocidad exagerada y no tocaba bocina; que Ortiz cruzó la carretera por detrás del camión; que sintió el golpe cuando Ortiz fué arrollado; que el automóvil público siguió corriendo por 38 trancos después de golpear a Ortiz; que no podía decir en qué forma Ortiz salió por detrás del camión porque él no lo vió; que ocho o diez pies delante del camión el automóvil público empezó a frenar, mientras el camión estaba parado todavía; que como vieron un automóvil que venía, se aguantaron en lo que éste pasaba para entonces salir.

Bienvenido Rodríguez declaró que venía de Quebradillas para Camuy en una guagua cargada de cocos; que paró la guagua a medio hectómetro detrás del camión para arreglar los cocos; que vió a Ortiz apearse del camión; que "al apearse dió la vuelta por detrás del truck rápido; iba bien ligero; entonces el carro que pasaba"; que no podía decir a qué velocidad venía el automóvil público porque éste corría en dirección contraria; que el carro iba un poco ligero; que el carro se desvió sobre una palma, allá fué a parar; que Ortiz iba un poco ligero cuando se apeó del camión y se fué por detrás; que él no notó si Ortiz miraba para ver si venía algún vehículo; que Ortiz no se detuvo cuando llegó detrás del camión sino que continuó corriendo; que el camión estaba parado a la derecha; que había suficiente espacio en la carretera para que los vehículos pasaran; que él no podía decir con exactitud si el automóvil iba a velocidad excesiva; que él sabía que fueron 38 pasos por-

que luego un policía midió las huellas que el carro público dejó; que Ortiz había tratado de cruzar rápidamente.

Gumersindo Hilera declaró que era dueño de la guagua cargada de cocos; que él nada vió, pero sólo sintió los frenos del carro. Esto completó la evidencia de los demandantes, en lo que concernía al accidente.

Daniel Fuentes Casiano, chófer empleado por el demandado, declaró a favor de éste al efecto de que a las 10 a.m. guiaba el automóvil público en un viaje de San Juan a Mayagüez; que mientras pasaba por el sitio ya descrito vió que un camión estaba parado a la derecha; que al mismo instante que él fué a pasar el interfecto salió corriendo por detrás del camión; que a pesar de tratar de desviarse no pudo hacerlo; que él tocó bocina como acostumbra usarla al pasarle a algún vehículo; que iba como a 25 ó 30 millas por hora; que al tratar de evitar el choque con Ortiz, se desvió, salió de la brea y aplicó sus frenos, pero Ortiz chocó contra el lado izquierdo del automóvil; que las ruedas nunca hicieron contacto con Ortiz; que este último chocó contra el automóvil y fué golpeado por la parte delantera izquierda de éste y la parte del parabrisas que queda cerca del chófer; que el sitio donde pasó tiene de 25 a 26 pies de ancho, midiendo desde el lado del camión hasta el final de la brea; que desde el borde del camión hasta donde termina la brea hay 15 pies; que se paró contra la palma; que si hubiera tratado de pararse rápidamente con los frenos, él y sus pasajeros se hubiesen volcado y hubieran resultado muertas cinco personas en vez de una; que nada le impedía ver o guiar libremente antes de llegar al camión; que como podía pasar no necesitaba pararse al ver el camión estacionado; que no esperaba que nadie saliera por detrás del camión; que él vió a Ortiz por primera vez cuando éste corría detrás del camión e inmediatamente frenó.

Celia María Perdomo, enfermera graduada, declaró que era pasajera en el automóvil público; que no vió el accidente

pero sintió el ruido cuando se rompió el parabrisas y el chófer desvió el automóvil y fué a dar contra una palma a la derecha; que el automóvil iba despacio y no a gran velocidad.

Consuelo Vélez Quiñones, secretaria empleada por la Autoridad de Fuentes Fluviales y también pasajera en el automóvil público, declaró que éste iba despacio o moderadamente y los pasajeros hablaban entre sí; que cuando vino el golpe, el chófer había frenado y desviado el automóvil a la derecha hacia la palma; que todo esto sucedió instantáneamente; que desde el sitio del choque a la palma había aproximadamente cuatro o cinco metros; que si el chófer no hubiera parado el automóvil, los hubiera matado a todos porque había un barranco; que todo pasó tan rápidamente que ella no puede decir si el carro se desvió y si los frenos se usaron antes o después de haber ella oído el golpe; que ella notó el golpe e inmediatamente luego los frenos y el desvío hacia la derecha; que le parece que todas estas cosas· ocurrieron simultáneamente.

Antonio Rivera Pérez declaró que es cabo del ejército; que también viajaba como pasajero en el automóvil; que cuando el chófer vió el camión, redujo la velocidad y tocó bocina; que vió a un hombre salir detrás del camión corriendo; que el hombre chocó con el automóvil por el lado izquierdo; que cuando el hombre le dió al automóvil el chófer desvió el automóvil fuera de la carretera y frenó, todo al unísono; que el carro iba a una velocidad moderada de 30 ó 35 millas; que cuando el automóvil paró ya estaba fuera de la carretera; que el choque con el hombre sucedió después de ellos pasarle al camión; que cuando el hombre chocó con el automóvil aquél quedó atrás, y el carro siguió; que como resultado de la frenada el automóvil se detuvo, pero no instantáneamente; que cuando el hombre chocó con el automóvil el chófer ya trataba de desviarlo; que había allí suficiente espacio entre el camión y el otro lado de la carretera para permitirle al automóvil pasar.

Cayita Bonelli de Santisteban, el cuarto pasajero, declaró qué venía sentada al lado del chófer; que el automóvil iba a una velocidad moderada de no más de 25 ó 30 millas por hora; que el chófer tuvo que pegar freno súbitamente y desviarse hacia la derecha porque un hombre salió corriendo detrás del camión sin fijarse ni nada; que el hombre le dió al automóvil a pesar del hecho de que el chófer trató de evitar darle; que ella no se acuerda si el chófer tocó bocina; que el hombre le dió al parabrisas; que el camión estaba parado cuando ella lo vió; que el automóvil público iba muy despacio; que el chófer redujo la velocidad y aplicó los frenos cuando vió al hombre; que el hombre corrió hacia el automóvil porque estaba corriendo cuando salió por detrás del camión a la carretera.

Como siempre, somos remisos en extremo a intervenir con las conclusiones de hecho a que lleguen las cortes de distrito. Pero si los hechos incontrovertidos revelan que no hay base posible para sostener la sentencia, como cuestión de derecho no debemos permitir que ésta subsista. Véase *Matos* v. *Pabón,* 63 D.P.R. 890.

Es difícil comprender sobre qué base resolvió la corte inferior que el automóvil público viajaba a velocidad excesiva cuando ocurrió el accidente. El chófer del camión y el peón declararon a este efecto, pero es obvio que dichos testigos se inclinaron a favor de los demandantes. El chófer de la guagua, estacionada detrás del camión, fué un testigo traído por los demandantes. Pero dicho testigo no tenía interés en el caso. Y declaró que no podía precisar la velocidad del automóvil ya que éste venía en dirección contraria. Del mismo modo, era igualmente difícil para el chófer y el peón, sentados en el camión, estimar la velocidad del automóvil que venía en dirección contraria. Por otro lado, todos los pasajeros del automóvil, que no tenían posible interés en exonerar de responsabilidad al dueño del

mismo y que tenían la mejor oportunidad para juzgar la velocidad de dicho automóvil, declararon que éste era guiado a velocidad moderada.

... Pero aun si aceptáramos la conclusión de la corte inferior de que el chófer guiaba el automóvil a velocidad excesiva y que no tocó bocina al pasarle al camión,(¹) no podemos convenir en que su alegada negligencia fué la causa exclusiva del accidente. El chófer y el peón, que se hallaban sentados en el camión, declararon fielmente en cuanto a un hecho obvio: estaban sentados en el camión y en consecuencia no podían ver en qué forma el interfecto salió de la parte de atrás del camión a la carretera. Pero el chófer de la guagua estacionada, testigo de los *demandantes*, dijo una y otra vez que Ortiz salió ligero y que iba corriendo. Esta importante declaración fué confirmada por todos los pasajeros del automóvil que repetidamente y de manera enfática testificaron que Ortiz no miró hacia donde iba, sino que se precipitó por detrás del camión a la carretera; y que le dió al automóvil, aun cuando el chófer hizo todo esfuerzo posible para evitar golpearlo, aplicando sus frenos y desviándose de la carretera.

Aun cuando supongamos que el chófer fué negligente porque conducía el automóvil público a mucha velocidad y no tocó bocina, estamos satisfechos de la evidencia presentada por los demandantes—así como de la del demandado—que la negligencia de Ortiz al precipitarse a la carretera y chocar con el automóvil público fué un factor contribuyente en este accidente. Por tanto, sus herederos no pueden recobrar daños por su muerte. *Gottstein* v. *Daly*, 7 P.2d 610 (Wash., 1932); *Farrar* v. *Koontz*, 16 N.E.2d 829 (Ohio,

---

(¹)El chófer y el peón, sentados en el camión, declararon que no oyeron bocina alguna. El chófer del automóvil público y todos sus pasajeros, que eran testigos desinteresados, declararon que tocó la bocina. Aceptamos la conclusión de la corte inferior sobre este extremo, si bien confesamos que la encontramos un poco dudosa. Sin embargo, no podemos comprender por qué el chófer tenía el deber de tocar bocina al pasarle a un camión estacionado. Véase el caso de *Meléndez* v. *Alvarez*, 35 D.P.R. 343.

1938); *Ortiz* v. *American Railroad Co.,* 62 D.P.R. 181, 197; *Maldonado* v. *Hamilton,* 32 D.P.R. 224; *Meléndez* v. *Alvarez,* 35 D.P.R. 343.

Si bien cada caso de negligencia depende en análisis final de sus propios hechos, en el caso *De García* v. *Figueroa & Gautier,* 52 D.P.R. 897, confirmado en 102 F.2d 148 (C.C.A. 1, 1939), excepto por el factor irrelevante de la velocidad, los hechos fueron sustancialmente similares a los del presente. En él la demandante trató de cruzar la avenida frente a un automóvil estacionado. Pero el demandado no la vió hasta que ya era tarde debido a que iba en la misma dirección que el automóvil estacionado. Aquí el interfecto no podía ser visto por el chófer del automóvil público porque viajaba en dirección contraria y el interfecto entró a la carretera por detrás del camión. En ambos casos, (pág. 898) "en el mismo momento en que el automóvil del demandado cruzaba junto al vehículo que estaba estacionado la demandante salió frente al demandado y a éste le fué absolutamente imposible detenerse a tiempo para evitar arrollarla, pero que advirtió el momento en que . . . [arrolló a] . . . la demandante y entonces detuvo el vehículo . . . ". Véase también *De la Paz* v. *White Star Bus Line, Inc.,* 63 D.P.R. 686; *Matos* v. *Pabón,* supra, pág. 900.

■ Hemos considerado la posibilidad de que no obstante la negligencia contribuyente de Ortiz, el demandado podría ser responsable porque su chófer tuvo la última oportunidad de evitar el accidente. Esta "doctrina da por sentada la existencia de una situación peligrosa creada por la negligencia tanto del demandante como del demandado, pero supone que hubo un momento después de ocurrir tal negligencia en que el demandado podía, y el demandante no podía, mediante el uso de los medios disponibles, evitar el accidente. No es aplicable si la emergencia es tan súbita que no hay tiempo para evitar la colisión, ya que el demandado no viene obligado a actuar instantáneamente." *Dean* v.

*Century Motors,* 154 F.2d 201, 202 (C.C.A., D.C., 1946); *Capital Transit Company* v. *Grimes,* 164 F.2d 718 (C.C.A., D. C., 1947); *Miranda* v. *Porto Rico Ry., Lt. & P. Co.,* 42 D.P.R. 719; *Ayala* v. *Matías,* 54 D.P.R. 348; *E. Solé & Co.* v. *American Railroad Co.,* 61 D.P.R. 752, 762–3; Anotación, 92 A.L.R. 47..([2])

Pero la evidencia presentada por las partes elimina esta posibilidad. El récord demuestra que inmediatamente después que Ortiz se precipitó a la carretera, el chófer del automóvil público no tuvo oportunidad razonable de evitar arrollarlo. En verdad, como ya hemos indicado, el automóvil no arrolló o le pasó a Ortiz por encima. Por el contrario, éste chocó con el automóvil. En su consecuencia, como cuestión de derecho, los demandantes no demostraron que Ortiz fué muerto debido exclusivamente a la negligencia del agente del demandado.

*La sentencia de la corte de distrito será revocada y se dictará otra desestimando la demanda.*

---

([2]) Véanse también 2 *Restatement, Torts,* secciones 479–80; Bohlen and Harper, *Torts,* sec. 138 *et seq.;* James, *Last Clear Chance: A Transitional Doctrine,* 47 *Yale L. J.* 704. Para un comentario en contra de las doctrinas de negligencia contribuyente y última oportunidad en jurisdicciones del derecho civil, véase Mac Intyre, *The Rationale of Last Clear Chance,* 53 *Harv, L. Rev.* 1225.